The final case being heard this morning is a case before panel I plus. It's number 07-5110 Inversa Sa v. United States. And Mr. Levine? Yes. And you've reserved three minutes for rebuttal. Is that correct? That's correct. Okay. You can start whenever you're ready. Thank you, Your Honor. May I please report? This appeal rests on two propositions. The first is that an enhancement to property provides a lasting increase in value. The second is that the government here made no enhancements to the Torre Miramar building because its modifications decreased the value of the building and it had to be removed by contract at the end of the lease. The expert opinions and the dictionary definitions submitted by Inversa below and repeated in our briefs on appeal clearly demonstrate that that substantial rebuttal from the government in any means other than bald assertion that the term enhancement makes plain that the phrase safety and security enhancements requires modifications that permanently increase the value of the building. Mr. Levine, I'm puzzled. I don't get things easily, so maybe you can help me out. There is, I can tell from reading your brief, a good bit of it is being devoted to the problem of restoring the property to a commercially attractive building. It raises in my mind the question of the obligation the government had to restore the building to its pre-government use. There was a requirement for that, wasn't there? Yes, there was. And your clients had the power to demand that that be done, and that issue is not before us because presumably you all agreed to whatever restorations were necessary. The lease conferred Inversa with the discretion to require that modifications be restored. And presumably they restored the building to whatever condition they wanted it in at the end of the lease. To date, Your Honor. Can we assume that since that issue is no longer being contested? We cannot because restoration has not occurred. There's a separate proceeding between these parties. It's pending before the Civilian Board of Contract Appeals. Fine. So that's going to get itself worked out. So we're not really concerned here about restoration, is that correct? We're not pursuing damages with respect to restoration, no, Your Honor. There's no issue here that the government did or did not restore the premises. No, the issue here is whether enhancements were made to the building  And can you just help me? I had trouble finding in the contract where that requirement was set out that the enhancements had to increase the value of the building. Section 6 of the settlement agreement specifically requires that the government would spend in excess of $2 million in making safety and security enhancements to the building. Safety and security enhancements. Yes, Your Honor. Which presumably means enhancements regarding safety and security. That's the position the government takes, Your Honor. That's not the position that our client takes, nor is it the understanding of our client at the time of the execution of the contract. But the language, there's no language in the contract that I missed other than that one sentence. The contract does not define the term enhancements. It does not specify whether we're talking about enhancements increasing the value or simply enhancements that would improve in some way, irrespective of value, the security and safety of the building. However... All right. So we've, you and I have, you've helped me understand two important points. One of them is we know now only what the language of the contract says. And secondly, the material in your brief about the property not being commercially as attractive as it might have been had they removed these enhancements, that really is irrelevant because that's a separate lawsuit. Oh, that is a separate lawsuit. Okay. So all of that material is not before us. The only question is whether the government met its obligation to put in these improvements in the way you think they should be done. Yes, that's right, Your Honor. Okay. Thank you. And the way... Is it your position that enhancement is an ambiguous term? We do not contend that it's ambiguous. No, we think that it's quite clear based on the various dictionary definitions that were provided in the briefs and to the court below that the term enhancement unanimously among dictionaries such as the Webster's Dictionary, Laxbo Dictionary, Random House Dictionary, several Spanish-English translation dictionaries, all conclude that the term enhancement pertains to an increase or an augmentation of value. Even when it says security? Yes, Your Honor. The simple fact is that these are entirely consistent propositions. The value of the building is to be enhanced through these means involving security and safety. Is there any extrinsic evidence in the record at all where the parties talked about this at all? Well, for example, Your Honor, one very prominent example is a joint appendix 794 and 795. This is a letter that the U.S. Embassy's contracting officer, Lawrence Rebo, wrote to Dr. Juan Arias, who was the president of Inversa, in which Mr. Rebo was seeking to persuade... What page is this? 794 and 95. This was a letter that was inadvertently omitted originally, which would supplement the joint appendix with the consent of the government in November. If the court would like, we do have copies of the document. I don't have it. My appendix doesn't have a 794. Mine goes from 738 to 795. Yes, because as I say, Your Honor, we supplemented the joint appendix by motion, which was granted with the consent of the government to include this document that was accidentally omitted maybe in the first instance. We do have additional copies in the event the court does not receive them. Perhaps they could be, if we could take just a minute... Can we stop the clock, Mr. Benjamin? Maybe just hand those up to Mr. Benjamin, and he can give them to the court. Let me just, after that's done... And this isn't on anybody's time, because we have a procedural point. I want to ask the government if it... Thank you. Mr. Hipp, do you have any objection to this? No, Your Honor. Okay, fine. All right, now, so this is... So this document is part of the record. It's deemed now part of the appendix. And what... Now, if you could, Mr. Benjamin, start the clock again. Thank you. Didn't want to have that cut into your time, process it. But if you could direct us to what's important here, Mr. Lee. Yes, I appreciate the opportunity. And for the record, we were granted leave to do this by order actually on November 20th. This letter in the last paragraph on page 794 specifically indicates that Mr. Rebo is attempting to convince Dr. Aras to accept various, at the time, proposed modifications on the grounds that they would increase the value of the building. Specifically, toward the middle and then the end of this paragraph, Mr. Rebo states, and I quote, it is felt that the renovations will add substantially to the value and safety of the building. He continues, restoration to a lesser value and less safe condition would seem an unlikely possibility. And then in the next sentence, Mr. Rebo continues, noting that the plans submitted to Dr. Aras for his approval demonstrate that the building should increase in value and safety. We consider this to be very important as an extrinsic evidence-judging grant of the government's understanding of the term. Or it says adding substantially to the value that follows the clause where they are asking you to approve a waiver of the restoration clause. Yes, precisely. They're seeking a waiver of the restoration clause because it is implicit in the lease that Inversa would only waive restoration for those modifications to the building that in fact confer value upon it. Otherwise, Inversa would be acting quite irrationally if it required the restoration of modifications to the building that were valuable to it. OK, but if you have some modifications that increase value and some that don't, so you don't waive restoration on the ones that increase value, but that still leave enhancements, security enhancements, that don't increase value, we don't waive restoration. In this particular case, Inversa did not waive restoration for any of what were then the government's proposed modifications. So there were no enhancements ultimately conferred upon the building, no value ultimately provided to Inversa, because upon Inversa's analysis of the proposed modifications, it concluded, as was its discretion under the lease, that they would not add value to the building, they would not improve its marketability, its leasability, they would potentially be detrimental to the value of the building, which is confirmed by the three letters submitted from real estate experts to that effect, and therefore did not waive restoration of the modifications. Are you arguing this letter constitutes an amendment to the lease, or to the, not so much to the lease, I guess, to the settlement agreement? Our position about the letter, Your Honor, is that it is indicative of the intent of the court. Is that a yes or a no? It's a no. No, you're not arguing it's an amendment to the agreement, in which case, don't we have a parole evidence problem? Your Honor, under the Panamanian Civil Code, which is the law that governs the interpretation and construction of the contract, Articles 1132 and 1133, in the event that there is a perceived conflict between the meaning of a term used in a contract and the intent of the parties, the intent of the parties governs. But that's classic contract law. You remember your first-year contract law, I'm sure, probably better than I do. The intent of the parties is the intent at the time the contract is made, not at some later time. As I look at the date on this, it comes up a year or two after the actual agreement was signed. It is a later time. In Article 1133 of the Panama Civil Code says that the intent is assessed based on the actions of the parties contemporaneous with and subsequent to the execution of the document. I guess you're saying, Mr. Miller, and correct me if I'm wrong, I think there is a doctrine. There are some cases in our circuit which have said when you're seeking to divine the intent of the parties or determine the intent of the parties, one gauge is their conduct during the period of the contract before a dispute arose. I think that's a valid proposition in government contract law in our circuit. I guess you're saying this Panamanian Code provision is kind of analogous to that? Is that what you're arguing here? Absolutely, Your Honor. It is analogous to that. And we would not rely only on this piece of extrinsic evidence. Indeed, our brief did not initially refer to this piece of extrinsic evidence.  in its brief, at page 23 of its brief, implicitly concedes that the term enhancements is a reference to an increase in value. The government states that the reason the court should conclude otherwise... Well, but the problem is, I mean, you have, as I think Judge Moran was saying earlier, you have here the clause in paragraph 6 says security enhancements. And certainly, I mean, my first reaction when I hear the word enhancement is kind of any kind of an improvement from a qualitative sense. Now, it may mean increasing the value. It may mean enhancing the safety. It may mean enhancing the cleanliness or the sanitary features or whatever. But it does seem that the word enhancement, whenever it appears, largely depends on the context. And you do have in clause 6 the context of a reference to security. Increase or improve the security. That is admittedly part of the context, Your Honor. However, we would submit that there is a broader context here. And the broader context would have to take account of provisions in the lease as well. The settlement agreement had affixed to it as Exhibit A the lease entered into simultaneously by the parties. And the provisions of the lease, particularly Articles 7 and 9, dealt with, first, the discretion of Inversa to determine what modifications made by the government could or could not survive the expiration of the lease. An embassy has fairly high security needs, much more than our office building does. So the building is going to be used for an embassy. You end up with a series of doors that you have to go through, that check through, to make sure that the access is secure, which you certainly don't want in a straight office building. Under the lease and the settlement agreement, putting in those security access conflicts, is that something that, one, the U.S. could do? The U.S. can do it. Yes, okay. Is it something that the lessor is going to have to agree to? The lessor has to approve such a modification. The separate question is whether it would need to be removed and the property restored. Okay, but it certainly doesn't increase the value of the property. Correct. And what if the lessor doesn't approve? I'm sorry, what if the lessor… You've got sort of a reasonable basis for refusal clause in there, don't you? Yes, one needs to act reasonably in approving the… So we'll assume that everybody agrees that providing secure access is something that's reasonable, necessary, and people couldn't complain about that. When it comes to after the settlement agreement and after the embassy moved out of there, does the lessor say, well, does that money that went into that, was that part of the $2 million? No, Your Honor. You're saying… It would not be part of the $2 million. We're saying that the $2 million are modifications to the building that would have some value for the owner of the building, which is consideration for the agreement. You're saying there are two kinds of enhancements. One is an enhancement that is solely for the benefit of the embassy and the government that you're going to have to restore, or at least the lessor is going to insist on restoring, and a separate kind of enhancement that is included in the $2 million which has to have an increase in value to the building. I wouldn't necessarily use the word enhancement for both of those, but yes, Your Honor, it makes sense to distinguish them in that way. And I would point out… No, you have to use the word enhancement for both of those because that's the only basis for your suit is the enhancement clause. Well, in only one of those examples, if I understood Judge Moran correctly,  to the owner of the building. But I understand the point that there are two species of modifications that are at issue there, and I would point out to the court we're not trying to set up an impossible scenario here. There were discussions and negotiations between the owner of the building and the government contemporaneous with executing the settlement agreement that dealt with different modifications, specifically a stairwell to the very roof of the building and certain hydraulic barriers at the garage entrance, which initially were proposed and then ultimately not made by the government, which would have been, we can see, modifications that were enhancements and that did add to the value of the building and that would have extended the $2 million allocation. Let me ask you one question if I could, and it sort of was triggered by your discussion with Judge Moran. Say it's undisputed the government spends $5 million. I know that's not the case here. It spends $5 million on security. Now, what happens then if you come back and say, well, only $1 million of this improves the value of the building? You would say, in other words, $5 million, clearly all of the $5 million does improve security, but only $1 million increases the value of the building. Where would the parties be then in that kind of a scenario? I realize we don't have that here, but I'm just sort of asking that as a hypothetical to test the limits of where the arguments are. I would like to make two responses to that. The first is that the issue that you pose, Judge Schall, would have been dealt with by the parties before the modifications were constructed because the lease requires that the waiver of restoration be granted or denied before construction occurs. I see it. The government asked for permission and for waivers of restoration before it did anything on the building. So Inversa did not surprise the government. Oh, no, I wasn't suggesting. I was just talking, you know. And consistent with that, the parties would have understood initially that on the order of $1 million would have been toward the $2 million and that the remainder were not toward the $2 million. So it would have been understood that either the government would do something to beef up the $1 million toward a confirmed value on Inversa or there would have been a dispute at the end of the lease over whether that $1 million is owed. We find ourselves in such a situation. Where in the contract, in the lease, does it specify that the government has the right to institute security, I'll use your word, modifications? Well, for example, in Article 9F of the lease, there's a reference to the government having the ability to make certain modifications and institute certain procedures for security and it's in connection with that discretion in Article 9F that the approval and also the restoration waiver issue is addressed. Again, it's also stated in the settlement agreement, of course, that these modifications are made. Mr. Levine, here's the problem I'm wrestling with with your case. The logic of it is the trouble that I'm having with it. Perhaps you can help me if I spell out what seems to me to be the logic of the case. The logic of the case is the government and Inversa get in an argument as to the original lease terms and what have you, and they sit down and they work out this modification, this settlement agreement. In the settlement agreement, they renegotiate the rent, perhaps less than Inversa might have wanted, but we don't know, and then they stick in a sentence saying something to the effect that the FBO has budgeted and plans to expend $2 million for security and safety enhancements. It's not entirely clear whether that was a promise for the benefit of Inversa or whether that was Inversa. I keep calling you Inversa. Benefit for Inversa, or was that simply a statement of fact that this is what they were planning to do and you should know it? It's unclear from the negotiation. In any event, the logic of it is, it seems to me, is that in addition to that, your client has the ability to make them undo anything that your client wants them to undo. The logic of it seems to be that we were all in agreement that the government was going to use this for an embassy. Embassies are scared to death they're going to get murdered 24 hours a day. They want to put in all these safety things, and to the extent the safety things accrue to the benefit of the building, of Inversa, that's fine. You won't make them take it out, like the fire alarm and the improvements to the heating and lighting and all the other stuff that is detailed in great detail in the government's brief. But to the extent there's stuff put in that makes the building less desirable, for whatever uses you want to make of it, you can have them tear it out. Maybe you want to rent to other embassies and want to keep some of these steel plates in. Who knows? But you have control. So the only real issue then is, have they taken out what you want taken out? Or have they done something else? But that's not before us. So I'm having trouble understanding the logic of what you're trying to seem to be claiming, which is that the security issues that an embassy needs somehow were understood to improve your building without regard to whether the government really needed it for security. It somehow was an obligation to improve your building for commercial purposes, which is hardly what security enhancements will ever do for anything except another embassy. So I can't find the logic in your position. Help me understand it. I'll do my best, Judge Breger. The logic of our position is that these were two sophisticated parties which sat down in a protracted series of negotiations over the settlement agreement and the lease. The government was already leasing certain space in the Torre Miramar building prior to the settlement agreement, and indeed it was those leases that resulted in disputes leading to the settlement agreement. And it was well understood that there were going to be certain constraints on the embassy being in a previously private structure, and it was understood by the owners of the building that the government was going to need to have certain security arrangements put in place. But the question as to which party ultimately would be able to determine whether the $2 million, the in excess of $2 million that the settlement agreement says the government shall expend in connection with the building was ultimately left with Inversa as the owner of the building because it was Inversa that would have to live with this building once the government decided it was going to move on, which it did in 2004. It was Inversa that would have to try to re-rent the premises or sell the premises. So you could not only require they remove it, but you could veto it even before they put it in. The whole premise, Your Honor, was that the Inversa would have the ability to veto it before they put it in. Yes, but there was no surprise. There could be some negotiation. For whatever reason, the government took a number of years to decide what modifications it would choose to put into the building, and the negotiations occurred over a period of years with Inversa. But at all times, there was a dialogue between the parties and an understanding, at least on Inversa's part, that these modifications to the building would either accrue to its benefit to the degree described in the settlement agreement, or would otherwise be outside of that framework and have to be restored back to the original condition of the building. And at the end of the day, Inversa is what a contracting officer for the government once described as a white elephant. It's a building that has been chopped up and subdivided in very strange ways because of the embassy's security requirements and had a number of other modifications made to it that render it very difficult over the time period after the government left to re-wrench, to make any productive value out of it, which is part of the subject of the other matter. Okay. Thank you, Mr. Lee. You've gone over your time. In fact, you've used up all of your time, plus you had another nine minutes or so. We'll give you some rebuttal because you did have a number of questions from the panel, and we'll hear from the government. Mr. Hipp. Thank you, Your Honor. May it please the court, the issue is straightforward. Did the government satisfy its obligation to expend $2 million on security and safety enhancements to this building? It's undisputed, first of all, that the government did in fact spend that amount of money and then some, and it's also undisputed that the money was spent on security-related items. And it's our position that that really should be the end of the case right there. That's how the trial court saw it, and that's how we make this court ought to see it. In the settlement agreement where you have the $2 million, why would the lessor want to have that $2 million as part of the settlement agreement if, in fact, it wasn't going to increase the value of the property at all? Well, there are several possible reasons for that, Your Honor. One is, as was suggested a moment ago, this provision of the settlement agreement could be construed as merely a recital. It starts off with the description of how many square feet are being occupied, and then it makes note that the government is taking possession of this additional space, and then finally it says that the government is going to expend the $2 million. So you could interpret this as merely a recital and an acknowledgement that these events are taking place and that these are the government's intentions. But the government, by putting them in the settlement agreement, was accepting an obligation, was it not? It was, and Inversa would have received benefits from this. One very reasonable way to construe this is an assurance from the government that it's going to invest money in this project and become a long-term tenant of the building. The lease agreement is for eight years with options to renew three additional terms of terms. It also has a termination for convenience clause that the lease could be terminated upon six months' notice. So the government's assurance here that it's going to invest an additional $2 million at least in the property could very reasonably be construed as just an assurance that the government intends to sink these costs in the building and therefore is more likely to serve out the full term of the lease and or renew it upon the conclusion. Mr. Hipp, what is your answer to the appellant's point that they're stuck with a building that isn't of much value to them on the commercial marketplace? The government did its thing, and I take it they're no longer a government lessor for whatever reason, and they end up after the government's occupation with a building that isn't even as valuable as it was when they began the lease. Now, doesn't the government have some responsibility for having done that to them? Well, again, that gets into the separate issue of what the government is obliged to do pursuant to the restoration clause, which is not part of this case, and that would be their remedy to the extent that they think that the government has not lived up to its expectations under the restoration clause. So your argument is whatever condition the building is in has nothing to do with this case? That's right. That's not what's at issue in this appeal. That's what's the subject of the proceedings in a board contract appeals proceeding? That's right, yes. Because the only issue here is the claim, I guess Mr. Levine's claim, or I should say in Bursa's claim, is under the settlement agreement, correct?  And that's the provision that the government has. The Court of Federal Claims had jurisdiction over the document. I think the more that you look at the paragraph in question and scrutinize it, the less and less reasonable In Bursa's position seems to be. If In Bursa was correct that the paragraph obliges the United States to increase the value of the building and make permanent enhancements, that would lead to all sorts of strange constructions. It's not clear, if In Bursa was correct that it has to increase the fair market value of the building, it's unclear as to whom the customer is. Presumably the United States thought that it got fair value for what it paid on this, and presumably someone else with the same security requirements, such as another embassy, another government country, who might be interested in this building. These investments may be worth $2 million to them, but how we're supposed to decide many years after the fact whether who the customer is, whether it's an ordinary commercial tenant, whether it's going to be another embassy. How do you read, Mr. Hipp, that document that Mr. Levine brought to our attention that was the subject of the supplement to the appendix? That document addresses a completely different clause of the contract. Again, the government is trying to persuade... Is it a cause of the contract, for us, or the lease? I guess it would be the lease, right? I'm sorry, here I have it. You presumably got a copy of that before today? Yes, sir. Okay. Help us understand what, as Judge Hall asks, what you think it means. Well, I mean, there's really no doubt as to what it means. It just says very plainly, it is also being asked that you approve a waiver of the restoration clause of the lease. So all the government is trying to do here is to persuade them to exercise their discretion to waive the restoration clause with respect to the renovations plans as they stood in 1993, which is nearly three years after execution of the settlement agreement. So to the extent that the government is trying to persuade them that it's in their interest or that they are obliged in good faith to exercise their discretion to consider the effect on safety and the effect on value, it's all related to the restoration clause, not the expansion clause. Not paragraph 6. You say it doesn't relate to paragraph 6 of the settlement agreement. That's right, it doesn't relate to paragraph 6 of the settlement agreement. Well, Mr. Levine, I mean, I think the thrust of his argument is that this shows that conduct during the period of the contract, and it shows the government understanding or of the view that enhancement of value was a consideration. I mean, I think that's the argument he's making. Do you agree? I mean, I'm not asking you to agree with that argument, but do you agree that's what he's saying? That's what I understand the thrust of his argument to be. And what's your response to that? It's just not relevant. This letter is dated three years or so after the settlement agreement. It's referring to a different agreement. It's referring to the lease clause, and it's just a letter attempting to persuade Inversa to do the right thing with regard to another clause of the contract. While we're clarifying documents, let me see. Again, I have trouble following all of this a little bit. I need help. There was an original lease. That got into a dispute, and then there was this settlement agreement, which is where the key clause 6 comes from, Section 6. That settlement agreement led to a new lease. Is that correct? Correct. And then in your brief on the bottom of page 4, you say, the condominium association comprised of owners of the Tory-Miramar building and that the United States entered into a contract agreement on November 1, 1991. Is that yet in addition to all of these other agreements? And if so, how does that tie into anything? It's in your brief. I assume that you were the cause of that piece of information. I couldn't connect it to anything else. I was hoping maybe you could. Do you see where I'm reading? Yes, I do. Because that's the document that apparently spelled out what some of these security and safety enhancements were going to be. Guard booth, alarms, internal staircase, et cetera. Well, there's a site, Mr. Hipta, JA 539. Right, which is part of the consolidated statement of uncontroverted facts. But we don't have, and that in turn refers to Appendix 5051, which I guess was an appendix before the Court of Federal Claims. Correct. In someone's submission there. But the only site for this is, as you say, the statement of uncontroverted facts that the parties agreed on. Maybe it's not important. I was hoping, though, that you could help me understand a little bit of this. It's our position that that agreement is not important to this case. Okay. That's why you cited it. I got you. Okay. I'm assuming that your position is that the word enhancement is unambiguous. Well, it's our position that the entire phrase, safety and security enhancement, is unambiguous. Okay. But for somewhat different reasons than plaintiff. The plaintiff's definition is really not all that different, and I want to take issue with something that Mr. Levine said. Their experts in Panamanian law did not go so far as to say that an enhancement has to be an increase in the value of the building. All that they've done is to cite English dictionaries and Flax Law Dictionary for the definition of enhancement. And to the extent that they're merely quoting dictionaries back to the court, I would suggest that their expertise is really not necessary. The trial court and this court are perfectly capable of knowing what the word enhancement means in English. But in each case, I believe in each case, their experts cite the primary definition of enhancement, which is just an increase or an improvement. And then the secondary definition is sometimes something that increases in value. So when you read it together in this context, where you're talking about safety and security enhancements, not merely enhancements in a vacuum, the ordinary first definition ought to be given priority, which is just an increase or an improvement. You're saying the contract provision is unambiguous given the context in which the word enhancement appears in Clause 6. Or Article 6. And the only other point I would like to point out, and this is for the questions from the panel, again getting back to the idea that their fair market value formula is just unworkable, is the timing question. If it were true that the government was obliged to deliver $2 million worth in value, there's a question it would be completely unworkable as to when the timing of that should be assessed. These renovations took place for the most part in 1995 and 1996. They're citing letters from appraisers from the year 2004. So I guess an adverse interpretation, we don't know until many years after the fact when the claim is in litigation whether the value of the enhancements were sufficient. What if there's a real estate boom in the meantime that increases the value of the enhancement? What if there's a bust in the meantime that decreases the value of the enhancement? That's why the straightforward language of the agreement just requires the government to expend, expend $2 million. Well, that's the trouble I'm having with your position, counsel, which is it seems to me that the placement of this clause in the settlement agreement suggests that the government undertaking a $2 million enhancement, even if the items to be enhanced are focused on security and safety, is in a way an additional rent payment. And if it is an additional rent or a compensation for a lowered rent overall, then I can't imagine why they would bargain for the government's doing something that is of only interest to the government and no value to them. And it seems to me that if that's the way the agreement was set up, then they have a pretty good argument that the $2 million was an additional rental accommodation, which only makes sense if it's there after you move out. And if it's there after you move out and it is not to their advantage, the fact that you can take it out doesn't add anything. It has to be something in addition to what was there at the beginning or will be left at the end. That is of value to them. So I'm having trouble figuring out why the government agreed to $2 million of something in quite the way they did. Help me with that. Well, first of all, I tried to address that before by saying that this language could be interpreted as recital or as an assurance of potential long-term tenancy. So that it wasn't a promise to do something for them. It was simply an assurance of good faith on the part of the government as a tenant. That's right. A statement of overall commitment. Yes, and just an assurance that the government was not going to walk away early from this lease. You think that was needed after they bound themselves to a long-term contract? Well, again, the contract could have been terminated for convenience upon six months' notice. What about the argument that the lessor never specified what enhancements it considered as value enhancements? Well, again, that's part of it, and that's also partially responsive to the previous question. If the verse is correct that it gets to decide at the end of the lease what it wants to keep, and that counts as what is permanent and what is an enhancement, then the government doesn't have any assurance at the time it spends the money that what it's spending on is going to count. It becomes illusory if they're holding too much power to veto changes at the end. That's an unreasonable construction. The government couldn't have rationally bargained for an agreement that says we'll spend $2 million, but you can tell us at the end of the lease whether you think that was good or not. Thank you, Mr. Hipp. Thank you, Your Honor. Mr. Levine, we'll give you three minutes of rebuttal. Because even though you went over, you did have a number of questions. I appreciate that, Judge Schall. Thank you very much. I'd like to address some points made by Mr. Hipp. I'll take the last statement he made first. Mr. Hipp made reference to the notion of Inversa deciding at the end of the lease what modifications needed to be restored. But as I indicated in my discussion, as the documents demonstrate, the decision about restoration is made up front, initially, before any modifications are made. In fact, the government specifically requested that Inversa waive restoration before it broke ground on a single modification. So there's no possibility of the surprise that Mr. Hipp is alluding to or the unreasonable construction that Mr. Hipp is alluding to, which might have taken place if Inversa could have made this decision only at the end of the lease. And then turning to additional points that Mr. Hipp made, there's a suggestion that the settlement agreement's provision regarding the enhancements is merely recital, but the settlement agreement has several recitals. It has several whereas clauses, which are the recitals for the agreement. And paragraph 6 is not a whereas, but it's a myth that it can't reasonably be construed as a mere recital, and indeed it uses mandatory language. It says the government shall spend in excess of $2 million, indicating that it is not merely a recital or surplusage, but actually a binding commitment that the government has made. Mr. Hipp also questions the relevance of Contracting Officer Rebo's letter suggesting that it somehow pertains only to the lease, but that that has no bearing on the settlement agreement. But I would remind the Court that these two documents were integrated together. In paragraph 15 of the lease, there was an integration clause which specifies that Exhibits A, B, C, and D of the lease are integrated into and made a part of the lease, while Exhibit A of the lease, as I'm sure Mr. Hipp is aware, is the settlement agreement. These two documents, combined with the several others in the other exhibits, constitute the total agreement between the parties. So for Mr. Rebo to be talking about something that pertains to provisions of the lease, it's understood that those relate equally to the settlement agreement because the modifications discussed in the settlement agreement are the very modifications that the approval and restoration provisions in the lease pertain to. And then, finally, Mr. Hipp raised the question of when would you assess the value, the alleged added value? Would it only be at the very end of the lease or would it be earlier? We submit, as occurred here, the assessment is made initially when Inversa determines whether or not to require restoration. Should restoration be required, the indication is that value is not being provided. Should restoration not be required, the indication up front is that the value is being provided. Here, the real estate letters came in 2004 because that's when the space was vacated and the question of how to re-rent them first arose. Thank you, Mr. Levine. The case is submitted. Thank you, Mr. Chairman. All rise. We are adjourned this afternoon at 2 p.m.